# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## CA 12-220

**GREGORY KEVIN POOLE III**

**VERSUS**

**KRISTIE MCMILLIN POOLE**

**********

APPEAL FROM THE
SEVENTH JUDICIAL DISTRICT COURT
PARISH OF CONCORDIA, NO. 45026
HONORABLE RONALD L. LEWELLYAN
DISTRICT JUDGE PRO TEMPORE

**********

**JIMMIE C. PETERS**
**JUDGE**

**********

Court composed of Oswald A. Decuir, Jimmie C. Peters, and Billy Howard Ezell, Judges.

**AFFIRMED IN PART AS AMENDED, AND REVERSED IN PART AND RENDERED.**

**Brent Stafford Gore**
**Attorney at Law**
**111 Serio Blvd.**
**Ferriday, LA 71334**
**(318) 757-4545**
**COUNSEL FOR DEFENDANT/PPELLANT:**
    Kristie McMillin Poole

**Jack Hendrix McLemore  Jr.**
**200 Advocate Row, Ste B**
**Vidalia, LA 71373**

**(318) 336-9189**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **Gregory Kevin Poole, III**

**PETERS, J.**

Kristie McMillin Poole appeals certain aspects of a trial court judgment awarding her and her husband, Gregory Kevin Poole III, joint custody of their two minor children. This judgment established the particulars of that joint custody arrangement, awarded her $100.00 per month in child support, divided the use of federal and state tax dependency deductions for the children, and relegated certain other financial issues to a future community property partition action. For the following reasons, we amend the trial court judgment to make the child support award to Kristie McMillin Poole retroactive to January 14, 2011, reverse the semi-annual federal and state dependency tax deduction award to Gregory Kevin Poole III, and render judgment awarding the entire federal and state dependency tax deduction to Kristie McMillin Poole. We affirm the remainder of the judgment as amended.

## DISCUSSION OF THE RECORD

### *Procedural History*

Gregory Kevin Poole III (Kevin) and Kristie McMillin Poole (Kristie) were married on August 26, 2002, and two children were born of their relationship: Joseph Nathaniel Poole, born February 14, 2001; and Nicholas Avery Poole, born May 6, 2004. This litigation initially began on November 12, 2009, when Kevin filed a petition seeking a divorce pursuant to La.Civ.Code art. 102.

In addition to his claim for a divorce under La.Civ.Code art. 102, wherein he asserted a physical separation date of October 21, 2009, Kevin sought joint custody of his minor children based on an equal time sharing arrangement; a judgment recognizing that neither party owed child support to the other; the right for each party to claim one child annually for income tax purposes; an equal division of medical expenses not covered by insurance; a recognition of each party's right to retain certain community property assets during the pendency of the litigation; injunctive relief with

regard to the disposition or community property assets; and a recognition that the community property regime terminated as of the date of filing this suit. He also requested that the trial court set a hearing to address, among other issues, the particulars of the custodial situation pending the final divorce decree.

The trial court set the show cause hearing for December 7, 2009. However, the hearing was never held because, on December 7, 2009, the trial court continued the hearing without resetting it. The trial court's order was based on Kevin's December 1, 2009, continuance motion wherein he asserted that he and Kristie had reconciled.

The litigation was not dismissed despite the assertion of reconciliation. Instead, it remained dormant until December 14, 2010, when Kevin filed a pleading purporting to supplement and amend his original petition by changing the date of physical separation from October 21, 2009, to October 14, 2010. With regard to the particulars of the remaining issues, Kevin's petition simply asserts that he "reiterates all allegations and prayers of the original petition." At Kevin's request, the trial court executed a new show cause order and set a hearing on the preliminary matters raised in his original 2009 pleading for February 24, 2011. The specific issues addressed in the hearing order were limited to the following areas: custody and visitation, the spouses' rights of use of the family vehicles, and the assignment of the debts associated with each vehicle. Other issues included the division of the children's medical expenses that fell outside of insurance coverage, child support, and the right to claim the children as tax deductions. Finally, the hearing addressed the question of fault regarding the dissolution of the marriage and the termination of the community of acquets and gains previously existing between the parties.

Kristie did not file any responsive pleadings until January 14, 2011, on which day she filed an answer and reconventional demand. In her answer, Kristie generally denied all of Kevin's assertions save for those related to their marital status.

2

However, despite denying the October 21, 2009, separation date in her answer, she asserted in her reconventional demand that the final separation did indeed occur on October 21, 2009. Specifically, she asserted that because October 21, 2009, was the date of final separation, she was entitled to an immediate divorce based on La.Civ.Code art. 102 and La.Civ.Code art. 103.1(2).

In the reconventional demand, Kristie also asserted that she was without fault in causing the breakup of the marriage; that November 12, 2009, the date of Kevin's initial filing, was the date of termination of the community of acquets and gains; and that she reserved her right to partition the property at a later date. With regard to custody, she requested primary custodial parent status, requested that Kevin's visitation privileges be supervised, and sought an award of child support, as well as reimbursement for medical expenses and other specific expenses she claims to have paid on behalf of the children. With regard to Kevin's fault and the need for supervised visitation, Kristie asserted that Kevin uses illegal drugs, that he physically abused her during the marriage, and that he struck one of the children during an abuse episode on at least one occasion. Finally, Kristie requested that some specific parameters be imposed on the custody arrangement, including provisions requiring Kevin to submit to an immediate hair follicle drug test, allowing the children to continue to attend the Monterey First Baptist Church on Wednesdays and Sundays regardless of the physical custody arrangement, providing for the proper daily administration of the children's medications, prohibiting either party from having overnight opposite sex visitors when maintaining custody, prohibiting Kevin from taking the children out of state, prohibiting either party from consuming alcoholic beverages in the presence of the children, and requiring Kevin to install a "land line telephone" in his home. Finally, Kristie sought an additional show cause hearing, but her only request for relief was that her pleadings alone (instead of Kevin's) should be

3

considered. The trial court set this rule for a hearing on February 24, 2011, as well. Kevin filed a general denial answer to Kristie's reconventional demand on January 28, 2011.

The record contains no evidence that the February 24, 2011, hearing took place, and the next pleading addressing a trial of the issues is a motion to set the matter for trial filed by Kevin on March 7, 2011. In that motion, Kevin made no mention of any preliminary rulings by the trial court and simply stated "that this matter is ready to be fixed for trial on the Petition for Divorce Under Civil Code Article 102 proceedings." Through this motion, the trial court set the matter for trial on March 11, 2011.

A hearing commenced on March 11, 2011, but the record does not reveal whether this was a hearing on preliminary matters or on the merits. When the trial began, neither counsel specifically addressed which issues would be considered. However, with regard to the ultimate issue of divorce, the parties attempted to stipulate that the final separation date was October 21, 2009, and that the trial court could grant a divorce immediately. However, the trial court judgment ultimately rendered did not address the divorce issue. The fact that the divorce issue was not before the trial court is supported by the motion filed by Kevin resetting the matter for trial after March 11, 2011. The motion suggested that "[t]he hearing on the Rule was not completed and the matter was continued," and that both sides desired "to have the RULE reset for the 2nd day of June, 2011[.]" (emphasis in the original).

After completion of the second day of trial, the trial court took the matter under advisement. On August 4, 2011, the trial court issued an "interim ruling pending a decision on the merits regarding all matters presented to the Court[.]" In that judgment, the trial court granted Kevin supervised visitation privileges with the minor children on the weeks he is home from work. The supervision element was to be satisfied by the presence of Kevin's father or any responsible adult member of his

4

family. Additionally, the trial court ordered that both Kevin and Kristie install a "land line" telephone at their respective residences within fourteen days of the judgment, that the children be allowed to attend a church of Kevin's choice when he has custody, that neither party nor their associates consume any illegal drugs or alcoholic beverages in the presence of the children, that both parents be restrained from physically abusing the children or each other, and that each parent refrain from making any derogatory or negative comments about the other in the presence of the children.

This interim judgment was followed by a September 9, 2011,[1] final judgment wherein the trial court awarded joint custody to Kevin and Kristie with Kristie being named as the domiciliary parent, but with the physical custody being divided as equally as Kevin's work schedule would allow. The judgment also ordered Kevin to pay Kristie $100.00 per month in child support, ordered that the parties alternate in claiming the federal tax deduction associated with the children, divided all school and medical expenses which might occur subsequent to the signing of the judgment equally between the parties, and relegated division of the prior expenses asserted by Kristie to future proceedings addressed at dividing the community of acquets and gains. The trial court filed its written reasons for its judgment contemporaneously with the September 9, 2011, judgment.

On September 29, 2011, Kristie filed her motion appealing certain aspects of this judgment. In her appeal, she asserts the following arguments, which she designates as issues rather than assignments of error in her brief to this court:

ISSUE I: The trial court erred in awarding custody or visitation equally split and by not requiring Kevin to have supervised visitation.

---

[1]The trial court actually executed the judgment on September 7, 2011, but it was not filed into the record until September 9, 2011.

ISSUE II:  Amount of child support.  The trial court erred in awarding Kristie $100 in child support and that amount should be increased retroactive to Nov. 12, 2009 when the divorce was filed.  R.S.9:315.21[.] The trial court should have given specific oral or written reasons for the deviation from the guidelines and a mechanical application of the guidelines and the particular facts and circumstances that warranted a deviation.  The reasons should have been made a part of the record.  R.S. 9:315.1 B (1)

ISSUE III:  The trial court erred in assessing the federal and state dependency deduction to Kevin and Kristie on an alternating annual basis and should have awarded that to Kristie.

ISSUE IV:  The trial court erred by ordering all reimbursement issues for school expenses, druggist bills, medical bills, hospitalization insurance premiums, vehicles[sic] notes and vehicle insurance premiums, baby sitter bills, be adjudicated upon the partition of community property pursuant to R.S. 9:280.1.

(emphasis in original).

## *Evidence Adduced at Trial*

The trial evidence presents conflicting versions of most of the events giving rise to the issues raised in this litigation.  However, the record does establish some facts not in dispute.

Both litigants and most of the witnesses who testified are life-long residents of Monterey, Louisiana, a small close-knit community located in rural Concordia Parish. During their marriage, Kevin and Kristine lived in Monterey in close proximity to both of their families.  In fact, their marital home was less than one half mile from Kristie's parents, James and Mabaline "Sissy" McMillin, and her sister, Tracy McMillin Velazquez (Tracy), and approximately four miles from Kevin's father, Gregory Kevin Poole.[2]  At the time of trial, Kristie and the two children were still living in the family home, and Kevin was living approximately two miles away.

---

[2] Kevin's mother died approximately in November of 2008, or over two years before the trial of this matter.  Although she is mentioned throughout the testimony, we find no reference to her given name.

Of significance to much of Kristie's arguments on the custodial relationship is the fact that Kevin is deaf,[3] a condition which came to his parents' attention when he was approximately six months old. His parents enrolled him in the Louisiana School for the Deaf in Baton Rouge, Louisiana at the age of four. Kevin lived in Baton Rouge during the school term, but commuted home on the weekends as often as possible, and spent the summers in Monterey. During his time in Monterey, he worked with his parents and his brother, James, in teaching them the sign language techniques he had learned in school. The result was that his mother and James both became fluent in the use of sign language. In fact, because of what he learned from Kevin, James has served as an interpreter for a hearing impaired witness in the Seventh Judicial District. Kevin's father learned enough to communicate with Kevin, but never considered himself fluent in using sign language. Over the years, Kevin also taught his grandmother, Anita Crouch Poole, enough sign language such that she was able to communicate with him.

After Kevin graduated from the Louisiana School for the Deaf, he returned to Monterey and found his opportunities limited by his impairment. Not being satisfied with drawing social security benefits, and wanting to make a better living for himself and his future family, Kevin sought employment. Initially, he found a position at a correction facility located in Concordia Parish and then a position at a construction site. In 2003, he began working with D & D Drilling and Exploration, Inc. (D & D) as a driller on a drilling rig. He worked with D & D for approximately seven years, leaving only because the rig to which he was assigned was stacked. After being unemployed for a short period of time, he then found another offshore position with Entergy Drilling Company (Entergy). At the time of trial, he had been working for

---

[3]All of Kevin's testimony was presented through a court-appointed interpreter.

Entergy for approximately seven or eight months. His work schedule is seven days on and seven days off, and when he is at work, he is confined to the rig twenty-four hours a day.

Kristie also maintained employment throughout the marriage, and at the time of trial, she was working as an occupational therapist assistant and rehabilitation director for Therapy Management Corporation and was performing contract services on behalf of her employer at the Adams County Nursing Center in Natchez, Mississippi. According to Kristie, her employment requires participation in situations requiring overnight travel. She testified that she normally travels overnight twice every quarter for two to three nights and once every quarter for one night.

Kristie and Kevin had known each other all their lives and had obviously established some degree of cohabitation before their marriage on August 26, 2002. She claims sign language skills taught to her through the Monterey public school system and acknowledges no difficulty communicating with Kevin despite his impairment. Additionally, she noted that while some face-to-face communication is helpful through gestures and lip reading, the communication aspects of their relationship were supplemented by writing messages, and in this modern age, through text messages on the cellular telephone. It is this latter means of communication that became the catalyst for the initial separation in October of 2009, although the actual event leading to the separation occurred in March of 2009.

On March 15, 2009, for no reason that Kristie has explained, Kristie picked up her husband's cellular telephone and began reviewing his stored text messages. While browsing, she claims that she discovered a message related to Kevin's procurement of illegal narcotics. Further examination revealed her husband's involvement in illegal narcotics trafficking.

Instead of immediately confronting Kevin, Kristie shared this discovery with her mother, her sister, her children, and at least one co-employee. Additionally, while at work that day, her mother telephoned to tell her that Kevin was looking for his telephone so she immediately took a picture of every entry. Later that day, when Kevin came to her place of employment and retrieved the telephone, she still did not confront her husband. Instead, she blamed her possession of the telephone on the children and instructed the children to not tell their father anything different.

Kristie testified that when she finally confronted Kevin, he initially denied using illegal substances and tried to explain away the text entries. However, according to Kristie, Kevin ultimately confessed to her that he had been using illegal substances for the past three years and had also used them the two years immediately prior to their marriage. In fact, he suggested that he used illegal substances on the drilling rig while working. She admitted that she had never personally seen him using illegal substances. Kristie's father, mother, and sister all testified that at some point thereafter Kevin admitted to each of them that he had been taking illegal drugs.

Armed with Kevin's alleged confession, Kristie then called Kevin's father and informed him of her findings. According to Kristie, Kevin's father immediately went to Kevin's place of employment, confronted him with the allegations, and then telephoned her to tell her that the allegations were true.

Kevin's father disputed Kristie's testimony on this subject. According to Mr. Poole, Kristie contacted him about his son's alleged drug use and showed him the questioned text messages. He did confront his son on the working rig, but Kevin denied using any illegal narcotics.

At trial Kevin denied any that he ever used illegal substances except for some marijuana use while in high school. He also denied having confessed to anyone, and denied any knowledge of the text messages exhibited to him by his wife. In fact, in an

9

effort to address his wife's concerns on this issue, Kevin agreed to take an across-the-counter hair follicle drug test. He claims he passed the test, and Kristie initially agreed. However, later in her testimony, she changed her testimony to assert that he had tested positive for opiates. The record contains no evidence of the test or its results. Additionally, Kevin testified that he had taken numerous drug tests as conditions of his employment and never failed any of them.

James Andrew Clem, a D & D tool pusher and Kevin's immediate supervisor while working for D & D, testified by deposition taken on May 18, 2011, that he had no trouble with Kevin during his employment and that he was aware of no illegal substance use by him. When making this statement, Mr. Clem was particularly referencing the 2009 period. In fact, according to Mr. Clem, a condition of employment with D & D is a negative test for illegal substances.

Jamie Randall, D & D's employee in charge of its payroll records, also testified by deposition taken on May 18, 2011, and provided more information on the company's drug testing program. He explained that in addition to the entry drug test, employees are tested once or twice per year. However, he also checked the company records and determined that Kevin was one of the employees not tested in 2009. He explained that this was not unusual given the economic times in 2009 which caused the industry to basically shut down most of the year. He also explained that if a supervisor requested a drug screen on any given employee, it would be administered immediately. The company records reveal no such request concerning Kevin in 2009, the only year requested by Kristie's counsel. He also noted that Kevin did not work on March 15 or 16 of that year because the rig had completed its last drilling job on March 11 and remained stacked until it began rigging up again on March 18.

10

Apparently this became the hurdle the couple could not overcome. Despite continuing to live together for another seven months,[4] they physically separated the first time on October 21, 2009, and Kevin filed his petition for divorce less than one month later. Despite no evidence of any illegal narcotic use since her alleged discovery in March of 2009, Kristie testified that Kevin's alleged drug use was the reason for this physical separation, although it was Kevin who filed for divorce.

Within days of the initial filing, Kristie and Kevin moved back in together. In his testimony, Kevin hinted that perhaps another reason for the initial separation was finances, because, according to Kevin, part of the reconciliation agreement related to how finances would be handled in the future. Basically, he suggested that they agreed they would continue to share basic expenses but that he would pay his individual bills, and she would be responsible for hers. Kevin and Kristie both testified that they resided together continuously until their final separation in October of 2010.

The catalyst for the final separation, according to Kristie, was another single incident which occurred on October 20, 2010, at the family home in Monterey. According to Kristie, she had texted Kevin to bring home some groceries. When she examined what he purchased, she found that he had bought nothing that the children would eat. When she commented on this to Kevin, he went to the refrigerator, opened the door and began throwing things into a trash basket. In the process, Nicholas was struck by the refrigerator door. According to Kristie, Kevin intentionally struck Nicholas with the door. The door swung shut and, when Kristie thought that Kevin was attempting to reopen it and strike Nicholas a second time, she intervened and shoved the door back toward him. In response, according to Kristie, Kevin placed his

_____

[4]The record contains little or no evidence concerning the relationship between the couple during this period of time.

11

left hand around her neck and his right hand on her shoulder, and pushed her to the floor while continuously choking her.

Kristie testified that when Kevin released her, she ordered him to leave the home and he refused. She initially attempted to telephone Kevin's father but received no answer. She next attempted to telephone Eddie Poole, Kevin's uncle who holds a supervisory position as a Captain in the Concordia Parish Sheriff's Office. This effort also proved unsuccessful, and she then telephoned the Sheriff's Office directly and two officers responded to the call. She next telephoned her sister, Tracy, and reported the incident to her.

Tracy testified that she arrived at the scene before the investigating officers and listened to both sides of the argument before the officers arrived. According to Tracy, Kevin acknowledged that when he opened the refrigerator door, it accidentally struck Nicholas. He also acknowledged wrestling Kristie to the floor but told his sister-in-law that he only did so after Kristie shoved him. That is to say, he asserted that Kristie was the aggressor in the altercation.

Concordia Parish Deputy Sheriff Dustin Lemoine testified that he and Concordia Parish Deputy Sheriff Jimmy Watts were the two officers who responded to Kristie's telephone call. According to Deputy Lemoine, when they arrived at the residence, Kristie was standing outside next to her vehicle. She told him that she and Kevin had been arguing, and it had become physical. Initially, he remained with Kristie and Deputy Watts went inside. Deputy Lemoine testified that Kristie told him Kevin had choked her. He observed that she was upset but not in serious distress. He observed no signs of injury to her neck.

Deputy Lemoine eventually joined Deputy Watts, Kevin, and Tracy in the house where he observed an interior in extreme disarray. According to Deputy Lemoine, clothes and items were scattered everywhere and it looked like the clothes

12

had been dirty for a long time. The children were sitting and watching television, and Kevin was cooking dinner for them, and other than the disheveled look in general, nothing seemed out of the ordinary. Kevin took the officers on a tour of the house, and then continued his cooking. When Kristie indicated that all she wanted was for Kevin to leave, he agreed to leave if they would let him finish cooking for the children. After completing the cooking chores, he left, and the deputies considered the matter settled. According to Deputy Lemoine, Kristie expressed a desire not to press charges, and no investigative record was made by the officers.

Kevin's version of the story diverges in key areas from Kristie's account. He testified that on the afternoon of October 20, 2010, he had just completed a three-day training class when he received a text from Kristie that she needed money for groceries. Instead of taking money to her, he stopped on his way home and purchased groceries. When he arrived home and began to put up the groceries, he observed old moldy food in the kitchen. As he was trying to dispose of the spoiled food, Kristie slammed the refrigerator door and almost hit him. In attempting to reopen the door, he accidentally hit Nicholas in the head. He testified that she became angry and threw the trash at him. He pushed back and this was the end of the altercation. When the officers arrived, he cooperated fully. With regard to the condition of the interior, Kevin's testimony supported that of Deputy Lemoine. Kevin asserted that not only was the living room and kitchen filthy, but the boys' room was a mess, as well.

The parties never reconciled after Kevin left on the afternoon of October 20, 2010, and he attempted to reinstate his original petition for divorce by the filing of December 14, 2010. Kristie testified that she did not press charges because she did not wish to humiliate her children any further. However, sometime in December of 2010, she changed her mind and attempted to press criminal charges against Kevin.

She testified that did so because "it was a good lesson for [the children] to learn that you don't just get to do whatever you want to do without some kind of consequences."

Once the separation phase was complete, the next major point of contention became visitation rights. After Kevin reinstated his divorce proceeding, and without leave to do so from the trial court, Kristie denied Kevin any visitation to his children, except for supervised situations approved by her. This led to another confrontation which occurred on December 17, 2011, at which time Kevin attempted to see the children for a part of the Christmas holidays. When Kevin arrived at the former family home, Kristie denied him the right to see his children. Next, Kristie apparently telephoned Captain Poole to come to the scene. She also telephoned Laurie Ellard, a friend who also lives in the Monterey community, and asked that she also come over because she was frightened of Kevin. When she arrived at Kristie's house, Kevin was sitting in the driveway in his vehicle. As she approached the front door, Kevin began to scream, holler, and curse.[5] While she noted that Kristie appeared frightened, she also observed that Captain Poole was present. According to Ms. Ellard, Captain Poole had been in the process of negotiating a settlement between Kevin and Kristie. The end result was that Kevin spent four hours with his children that evening, which represented his full Christmas visitation privilege.

While the October 20, 2010, incident constituted the basis for the final separation between the parties, the March 2009 texting incident remained center stage in the litigation. Despite the December 2009 reconciliation, the memory of the alleged drug activity remained forefront in Kristie's mind, and her next step after the final separation was to enlist the assistance of her mother and sister in clandestinely video recording visitation sessions between Kevin and the two children.

---

[5] There is nothing in the record to explain how Kevin was capable of this response given his physical impairment.

14

The video recording was easily orchestrated because the homes of her mother and sister were two locations where she would allow Kevin supervised visitation. On two separate occasions in February of 2011,[6] Kevin attempted to exercise visitation with his children pursuant to Kristie's rules. What he did not know at the time was that a video camera had been set up in each house, purportedly to generate a record of his inability to communicate with his children. While that may have a part of the intent in video recording the visits, in both instances Mrs. McMillin and Tracy maneuvered Kevin into a position in front of the camera and interrogated him concerning the alleged past drug activity.

The first of the two video events occurred at Tracy's home, and apparently, Kevin only became aware at a later time that he had been video recorded. However, after the video recording subsequently began at Mrs. McMillin's house, he discovered the camera and became very upset. He testified that he was puzzled by the rather weird questions propounded by his mother-in-law, but was so excited to see his children that he initially ignored them.

Another contested fact related to the recording incidents is the level of involvement of Kristie's mother and sister. In both instances, Kristie claimed that she arranged the video camera with the full permission of both her sister and her mother. However, both Tracy and Mrs. McMillin testified that they had no conversations with Kristie concerning the purpose of the video camera and received no instructions concerning their role in the activity. They suggested in testimony that Kristie came in and set up the camera, gave no instructions, and they asked no questions. At the same time, Mrs. McMillin testified that she actually prepared written questions, the subject of which was Kevin's alleged narcotics activity. As with the initial allegations of

---

[6] The testimony suggests that the video incidents occurred in February of 2010, but it is clear from the record that they occurred after the final separation in October of 2010.

15

illegal substance abuse asserted in March of 2009, none of the three women considered discussions of Kevin's alleged narcotic difficulties in the presence of the children inappropriate.

Kristie asserted to the trial court that supervised visitation was required because of the dangers posed by Kevin's physical impairment. She suggested that it would not be safe for Kevin keep the children overnight or to take his children out-of-state because of his inability to communicate in the event of unexpected trouble. Furthermore, she suggested that Kevin was unable to communicate even with his children. Additionally, Kristie testified that the children had not spent the night alone with their father since the marriage began to unravel in March of 2009. With regard to communication skills, Kristie acknowledged that when they lived together, Kevin would assist in meeting the children's basic needs, including bathing them and cooking for them. However, as they became older and more mobile, this assistance ceased. She also is concerned that Kevin will not teach them to sign fluently; and therefore, will not be able to assist them with scholastic tasks such as homework. In support of this point, Kristie testified that the older child has only basic sign language skills, and that the younger child has none at all.

To bolster her contention that the children are incapable of communicating with their father, Kristie retained the services of Dr. Daniel D. Burch, a Baton Rouge, Louisiana physician, who suggested in his testimony that he is an expert in the fields of "[d]eaf culture, American deaf community, American sign language and interpreting."[7] Dr. Burch testified Kristie contacted him concerning performing an assessment of the sign language skills of Joseph and Nicholas. He examined the children's abilities by interviewing them in sign language only. According to Dr.

_____

[7] Nothing in the record suggests that the trial court ever recognized Dr. Burch as an expert in these fields.

16

Burch, neither child could respond to the simplest of sign language usage. He acknowledged, however, that when verbally asked, Joseph could sign the alphabet. Dr. Burch also declined to verbalize an opinion concerning whether Kevin should be limited to supervised visitation rights.

Despite Kristie's concerns with Kevin's communication skills, both her mother and sister testified that they had no difficulty in communicating with Kevin. According to Mrs. McMillin, she developed the necessary communication skills even before Kevin and Kristie were married. Tracy did not testify as to where she acquired her sign language skills but noted that she had known Kevin all of her life. Still, Mrs. McMillin supported her daughter on the issue of supervised visitation by testifying that Kevin does not interact with the children and does not play with them. She also suggested that Kevin has a temper and tends to discipline the children too harshly. According to Mrs. McMillin, she has often gone to the family home to pick up the children only to find Kevin asleep and the children left unattended.

With regard to the children's main environment, Mrs. McMillin testified that she, and not Kevin nor Kristie, is the primary caregiver for the children. She kept both children daily, even when Kevin and Kristie were living together, and has been doing the same since the separation.[8] When Kevin and Kristie lived together, she would see Kevin almost every afternoon when he came to pick up the children. Additionally, according to Mrs. McMillin, while the children generally sleep at Kristie's house, they often spend the night with her and her husband. Mrs. McMillin's recollection was that the children had never spent the night alone with Kevin.

Concerning these assertions, Kevin testified that despite his impairment, he is fully capable of caring for and communicating with his children. He currently resides

_____

[8] Although both children are enrolled in school, she still keeps them every day after school.

17

in a three bedroom home, and each child would have his own room. He pointed out that he has never had any problems with the law, is in good health, and cared for and communicated with his children the entire time he and Kristie lived together. Pointing to the fact that he has developed the skills to communicate daily with people who lack any sign language capability whatsoever, one can conclude that his communication skills are not limited to mere sign language. He admits, however, that communication with his children is a work in progress and requires a tremendous amount of patience. He considers Joseph to be well on his way to mastering sign language but suggests that Nicholas lingers behind. Given the length of their relationship and the responsibility he had taken during that time, Kevin expressed surprise over Kristie's assertions that suddenly he is not capable of caring for or communicating with his children. During their time together, Kevin had enjoyed hunting and fishing with Joseph and took pride in the fact that Joseph had, at his age, already killed four deer. Kristie acknowledged that she has let Kevin take the boys fishing and to their sports practices, but has refused to allow him to take them hunting. Still, she was aware that Joseph had killed a deer, but she thought that occurred when he was hunting with his paternal grandfather and not with Kevin.

James Poole (James), Kevin's younger brother, testified that his brother interacts well with his children and communicates easily with the use of sign language, gestures, and other forms of communication. Concerning Kevin's ability to teach his children, James noted that one need only look to those he had already trained, himself included. He disagreed with Mrs. McMillin's testimony concerning overnight stays, recalling instances before the marriage breakup when Kevin would care for the children when Kristie was on overnight business trips. He also recalled some instances there the children stayed overnight with his parents. With regard to the home environment, James stated that Kevin's home is generally cleaner than

during the marriage and he believes Kevin is fully capable of unsupervised supervision. James also noted that Kevin attends every sporting event participated in by his children when he is not working. In fact, according to James, Kevin has actually coached the football team played on by his sons.

Kevin's father testified that Kevin is just like any normal father in that he is very protective of his children. According to Mr. Poole, Kevin uses everything available to him to communicate, and if all else fails, he simply writes him point down. He suggested that while Kevin cannot hear, his other senses "kick in" to help him comprehend what is going around him. He also testified that Kevin had been the individual primarily responsible for the children when Kristie was on her weekend trips and that the children had spent the night alone with him. If a problem were to arise when Kevin had custody, he would be a simple text message away. As did James, Mr. Poole testified that the Kevin's current home is in much better shape than when he was working and Kristie was responsible for cleaning up. He suggested when Kevin was at work previously, the situation at home was "[l]ess than desirable" with clothes and dirty dishes everywhere.

Kevin's grandmother, Anita Crouch Poole, testified to the lack of communication problems between Kevin and his children. With regard to his ability to care for the children, Mrs. Poole testified to an October 2010 event when she allowed the children to swim in her pool. She noted that Kevin never left the children's sight for approximately one hour while they swam.

## OPINION

This is a fact intensive case, and it is well settled that an appellate court cannot set aside a trial court's factual findings in the absence of manifest error or unless those findings are clearly wrong. *Rosell v. Esco*, 549 So.2d 840 (La.1989). The custody of children is to be awarded in accordance with their best interest. La.Civ.Code art. 131.

19

Where there is no agreement concerning which parent should be awarded custody, or where that agreement is not in the best interest of the child or children, "the court shall award custody to the parents jointly[.]" La.Civ.Code art. 132. Absent an agreement, joint custody is mandated unless it can be shown by clear and convincing evidence that joint custody is not in the best interests of the child or children. *Id.* The issues in each child custody case must be resolved taking into consideration the particular set of circumstances arising in that case with the paramount goal of reaching a decision that is in the best interest of the child or children involved. *Barberousse v. Barberousse*, 556 So.2d 930 (La.App. 3 Cir. 1990). The trial court is vested with broad discretion in deciding child custody cases and its decision will not be disturbed absent a clear abuse of discretion. *Bagents v. Bagents*, 419 So.2d 460 (La.1982); *Stephens v. Stephens*, 02-402 (La.App. 1 Cir. 6/21/02), 822 So.2d 770.

### *ISSUE NUMBER ONE*

Although both Kevin and Kristie sought a judgment of joint custody in their respective pleadings, on appeal Kristie appears to assert that the trial court erred in awarding an equal joint custodial arrangement and in not requiring Kevin's visitation to be supervised.

Louisiana Civil Code Article 134 lists twelve nonexclusive relevant factors that the trial court shall consider in determining the best interests element of a custody dispute:

> The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
>
> (1) The love, affection, and other emotional ties between each party and the child.
>
> (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(3)  The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(4)  The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(5)  The permanence, as a family unit, of the existing or proposed custodial home or homes.

(6)  The moral fitness of each party, insofar as it affects the welfare of the child.

(7)  The mental and physical health of each party.

(8)  The home, school, and community history of the child.

(9)  The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(10)  The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.

(11)  The distance between the respective residences of the parties.

(12)  The responsibility for the care and rearing of the child previously exercised by each party.

In its written reasons for judgment, the trial court carefully considered each of these factors and found that application of the first five factors, as well as the eighth, eleventh, and twelfth, did not result in an advantage to either Kevin or Kristie.  The trial court also found, however, that the sixth factor would be relevant to this litigation.

The sixth factor evaluates the moral fitness of each parent and how that moral fitness might affect the custodial relationship.  In this case, the trial court found no direct evidence or history of drug abuse on Kevin's part; and furthermore, that the circumstantial evidence presented supporting Kevin's drug use was "simply not credible."  Results of drug testing established that Kevin tested negative each time he submitted to a drug analysis.  Additionally, the trial court found that the video

recorded attempts to elicit a confession from Kevin "[do] not reflect favorably on Mabelene McMillin," and declined to heavily weigh the text message issue in its analysis. Finally, the court determined that Kristie's attempt to establish Kevin's alleged narcotics use through social networking sites was similarly "not credible."

The trial court factually discounted Kristie's efforts to establish physical abuse at Kevin's hands. In making this factual determination, the trial court found that even Kristie's witnesses testified that they had never seen physical evidence of abuse, and the officers called to investigate on October 20, 2010 failed to support her assertions, as well.

Next, the trial court found the balance of the seventh factor of La.Civ. Code art. 134 tipped in Kevin's favor, as well. Specifically, the trial court found that Kevin's physical impairment was not of such a nature as to require supervision of his custodial time with his children. The trial court disregarded Dr. Burch's testimony, finding it to be in direct conflict with the testimony of the other witnesses, whom the trial court found to be "in a better position to observe KEVIN on a daily basis and therefore [be] more familiar with his communicative skills." Furthermore, the trial court rejected Kristie's assertion that Kevin could not actively monitor his children's activities.

Finally, the trial court found application of the tenth factor favored Kevin, as well. Specifically, the trial court concluded that Kevin would facilitate and encourage a close and continuing relationship between Kristie and the children but expressed "reservations" regarding Kristie's ability to do the same. Again, the attempted entrapment activity by Kristie and her family members concerned the trial court, as did their willingness to allow the minor children to observe the activity.

Kristie also argues that the trial court erred in splitting the custodial time equally. While the trial court's written reasons for judgment do not directly address the time division of custody, the trial court judgment states the following:

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that joint custody of the minor children, Joseph Nathaniel Poole and Nicholas Avery Poole, is awarded to KEVIN and KRISTIE with KRISTIE being named as domiciliary parent.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that (as long as KEVIN is working 7 days on / 7 days off) KEVIN shall have custody of the minor children on those weeks when he is home from work from 9:00 A.M. on the day after his arrival to 6:00 P.M. on the day before he returns to work and that KRISTIE shall have custody for the remaining time. In the event that 9:00 A.M. on the day after KEVIN's arrival falls on a school day, he shall begin his period of custody immediately after school on that day. It shall be KEVIN'S responsibility to insure that the children are in school on a timely basis during those periods when he is exercising custody and it shall be KRISTIE'S responsibility to insure that the children are in school on a timely basis during those periods when she is exercising custody. In the event that KEVIN's work schedule changes from "7 days on / 7 days off", either party shall be at liberty to apply to this Court for a revised custody schedule based upon what is more appropriate at that time. The general custodial provisions as specified in this paragraph shall be super ceded [sic] by the specific holiday visitation as set forth hereinafter. The condition in the "Interim Judgment" of this Court that KEVIN's custody/visitation should be "supervised" is hereby removed.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that specific visitation for the upcoming Labor Day week-end [sic] shall be divided between KEVIN and KRISTIE with KRISTIE having the children from Saturday morning at 9:00 A.M. until Monday morning at 9:00 A.M. and KEVIN having the children from 9:00 A.M. on Monday morning until 9:00 P.M. on Monday night. This Labor Day holiday schedule may be amended in the event of mutual agreement between the parties.

**IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that KEVIN shall have the children for Father's Day and his birthday and that KRISTIE shall have the children for Mother's Day and her birthday. The birthdays of the children shall be alternated between KEVIN and KRISTIE to the extent possible depending on the work schedule of KEVIN. KEVIN shall have the children on Christmas Day for odd numbered years and on Thanksgiving Day for even numbered years. KRISTIE shall have the children on Christmas Day for even numbered years and on Thanksgiving Day for odd numbered years. KEVIN shall have the children on Easter Sunday for odd numbered years.

In a decree of joint custody, the trial court shall designate a domiciliary parent except when there is an implementation order to the contrary or for other good cause shown. La.R.S. 9:335(B)(1). Additionally, La.R.S. 9:335(A)(2)(b) provides that in a

joint custody plan, "[t]o the extent it is feasible and in the best interest of the child, physical custody of the children should be shared equally." The trial court complied with both of these statutory requirements.

Given the evidentiary record before us and the trial court reasons for judgment, we find no error in the trial court's determination that an equal sharing joint custody arrangement was in the best interests of the two children involved in this litigation. Additionally, we find no error in the trial court's determination that Kevin's custody should not be burdened by supervised visitation requirements. Thus, we find no merit in the argument on this issue.

### ISSUE NUMBER TWO

Kristie asserts that the trial court erred in awarding only $100.00 per month in child support and in failing to retroactively award it beginning on November 12, 2009. She also asserts that the trial court erred by not providing oral or written reasons for deviation from the guidelines as required by La.R.S. 9:315.1(B)(1).

In its reasons for judgment, the trial court stated the following with regard to the award of child support:

> Based upon a review of the child support worksheets provided by both Kevin and Kristie, it is this Court's decision that an award of $100.00 per month to be paid by KEVIN to KRISTIE is appropriate as KRISTIE, being named herein as the primary domiciliary parent, will incur slightly more expenses than KEVIN over a monthly period. These support payments shall be paid by KEVIN on the first day of each month or such other date mutually agreed upon by Counsel for KEVIN and KRISTIE in writing.

The language in the trial court judgment mirrors the language in the reasons for judgment.

The statutory guidelines for determining the individual child support obligation are found in La.R.S. 9:315-315.36. The total amount due is calculated through the use of the combined adjusted monthly gross income of the parents and the application of

24

the support schedule and standard form support worksheets found in La.R.S. 9:315.19. Adjusted gross income is defined in La.R.S. 9:315(C)(1) as "gross income, minus amounts for preexisting child support or spousal support obligations paid to another who is not a party to the proceedings, or on behalf of a child who is not the subject of the action of the court." In this case, gross income and adjusted gross income are one and the same.

Calculation of the adjusted gross income is based on the litigant's submission into evidence of the documentation required by La.R.S. 9:315.2. Neither party to this litigation fully complied with that statute, and the trial record does not contain the child support worksheets referred to by the trial court.

The only evidence of Kevin's adjusted gross income is three payroll stubs: one for the period from August 24, 2010 to September 6, 2010, reflecting an adjusted gross income for that pay period of $1,917.50; one for the period from December 28, 2010 to January 10, 2011, reflecting an adjusted gross income for that pay period of $1,868.75; and one for the period from January 11 to January 24, 2011, reflecting an adjusted gross income for that pay period of $1,722.60. We decline to consider the first of these payroll stubs because it also reflects a year-to-date gross income of $11,923.00. Extrapolating this figure for the year would result in a monthly gross income of less than $1,000.00. Averaging the other two biweekly payments would result in an average of $1,795.67. Based on an assumption of twenty-six pay periods per year, conversion of this amount to a monthly income would result in an adjusted gross monthly income of $3,890.62. Kristie's 2010 W2 form introduced into evidence reflects an annual gross income of $71,883.39. This converts to a monthly adjusted gross income of $5,990.28. Thus, the combined adjusted monthly gross income for child support purposes is $9,880.90. Thirty-nine percent of this total is attributed to Kevin's income and the remaining sixty-one percent to Kristie's income.

25

Extrapolation of the amounts provided in the schedule found in La.R.S. 315.19 results in a combined basic monthly child support obligation of $1,793.00.

Louisiana Revised Statutes 9:315.3 provides that the basic child support obligation shall be increased by the net child care costs which "are determined by applying the Federal Credit for Child and Dependent Care Expenses provided in Internal Revenue Form 2441 to the total or actual child care costs." There is no evidence of compliance with this statute in the trial record and, therefore, no adjustment is required. Additionally, La.R.S. 9:315.4(A) mandates that health insurance premiums incurred on behalf of the child or children be added to the basic child support obligation, and La.R.S. 9:315.5 requires the addition of extraordinary medical expenses. While the record contains evidence of medical insurance on the children, the specific cost associated with the children versus the cost associated with the primary insured is not clear. Also, extraordinary medical expenses are defined as those "unreimbursed medical expenses which exceed two hundred fifty dollars per child per calendar year." La.R.S. 9:315.5. We find no evidence of extraordinary medical expenses in this case.

How an individual obligation of a parent is calculated depends on the nature of the joint custody decree. The decree before us represents a shared custody arrangement.

> (1) "Shared custody" means a joint custody order in which each parent has physical custody of the child for an approximately equal time.
>
> (2) If the joint custody order provides for shared custody, the basic child support obligation shall first be multiplied by one and one-half and then divided between the parents in proportion to their respective adjusted gross incomes.
>
> (3) Each parent's theoretical child support obligation shall then be cross multiplied by the actual percentage of time the child spends with the other party to determine the basic child support obligation based on the amount of time spent with the other party.

26

(4)  Each parent's proportionate share of work-related net child care costs and extraordinary adjustments to the schedule shall be added to the amount calculated under Paragraph (3) of this Subsection.

(5)  Each parent's proportionate share of any direct payments ordered to be made on behalf of the child for net child care costs, the cost of health insurance premiums, extraordinary medical expenses, or other extraordinary expenses shall be deducted from the amount calculated under Paragraph (3) of this subsection.

(6)  The court shall order each parent to pay his proportionate share of all reasonable and necessary uninsured medical expenses under the provisions of R.S. 9:315(C)(7) which are under two hundred fifty dollars.

(7) The parent owing the greater amount of child support shall owe to the other parent the difference between the two amounts as a child support obligation.  The amount owed shall not be higher than the amount which that parent would have owed if he or she were a domiciliary parent.

La.R.S. 9:315.9(A).

Applying this procedure, we first multiply $1,793.00 by 1.5.  This results in a total of $2,689.50.  Dividing this total by the proportionate percentages applicable to the individual income of Kevin and Kristie results in a total of $1,048.90 for Kevin and $1,640.60 for Kristie.  Because the trial court decree is basically an equal sharing arrangement, La.R.S. 9:315.9(A)(3) requires no additional adjustment.  Thus, applying La.R.S. 9:315.9(A)(7), Kristie would have been obligated to pay Kevin $148.00 as a balancing amount.

While we do note that the trial court did not provide extensive reasons for deviating from the guidelines as required by La.R.S. 9:315.1(B), it did suggest that the award was necessary because Kristie, as the domiciliary parent, would incur "slightly more expenses than KEVIN over a monthly period."  Given the fact that the deviation represents a $248.00 deviation in favor of Kristie, we find no merit in her complaint concerning the amount of monthly child support.

Kristie also asserts that the trial court erred in failing to make the award retroactive to November 12, 2009, the day Kevin filed his initial petition. In considering this argument, we first note that La.R.S. 9:315.21(A) provides that "[e]xcept for good cause shown, a judgment awarding . . . an interim child support allowance *shall* be retroactive to the date of judicial demand, but in no case prior to the date of judicial demand." (emphasis added). Because the trial court judgment is silent concerning the beginning date of the child support payment, we amend it to comply with this statutory mandate.

For two reasons, however, we do not make the child support judgment retroactive to November 12, 2009, as requested by Kristie. First, despite the attempted stipulation that October 21, 2009, should be considered the day of final separation for divorce purposes, the evidence presented at trial establishes otherwise. Both Kevin and Kristie testified that they reconciled in late November or early December of 2009, and lived together as husband and wife until October 20, 2010. Thus, the proper date for the beginning of this litigation is December 14, 2010. Secondly, La.R.S. 9:315.21(A) refers to day of judicial demand and not the day of filing of the petition. Kristie did not judicially demand child support until she filed her reconventional demand on January 14, 2011. Thus, we make the judgment retroactive to January 14, 2011.

## *ISSUE NUMBER THREE*

With regard to the use of the federal and state dependency deduction, the trial court stated the following:

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED**
> that Pursuant to R.S. 315.18 B (2) (a) and (b), the allocation for the federal and state dependency tax deduction is granted to KEVIN and KRISTIE on an alternating annual basis according to the preferences of the parties. In the event that KEVIN and KRISTIE are unable to agree in writing on the yearly designations thereof, then KEVIN is granted the deductions for even numbered years and KRISTIE is granted the

28

deduction for odd numbered years. Further, pursuant to R.S.315.18 B (2) (b), KRISTIE, as the primary domiciliary parent, is ordered herein to "timely execute all forms required by the Internal Revenue Service authorizing the non-domiciliary party to claim such deductions".

Kristie complains that this is error and that she should have been awarded the tax deduction for all years.

In this matter, Kristie was named as the domiciliary parent and a presumption exists that she "has the right to claim the federal and state dependency deductions and any earned income credit." La.R.S. 9:315.18(A). This presumption can only be challenged if the non-domiciliary parent's child support obligation exceeds fifty percent of the total obligation. La.R.S. 9:315.18(B). Kevin's obligation does not meet that threshold, and we find that the trial court erred in awarding him the right to claim the deduction every other year.

## *ISSUE NUMBER FOUR*

Finally, Kristie argues that the trial court erred in relegating her claims for reimbursement of various expenses to a community property partition action pursuant to La.R.S. 9:2801. In this regard, the trial court judgment provided the following:

> **IT IS FURTHER ORDERED, ADJUDGED AND DECREED** that school expenses, druggist bills, hospital bills, and hospitalization insurance premiums for the children which are incurred subsequent to the signing of this Judgment shall be divided equally between the parties. All reimbursement issues for school expenses, druggist bills, medical bills, hospitalization insurance premiums, vehicle notes and vehicle insurance premiums, baby sitter bills, debt consolidation loan payments, and any and all other matters pertaining to community property and/or reimbursement for payments of community/separate expenses shall be adjudicated upon the partition of community property pursuant to R.S. 9:2801.

In making her argument, Kristie directs us to no authority that would suggest the trial court erred in this portion of the judgment. We find no merit in the argument on this issue.

## **DISPOSITION**

29

We amend the trial court judgment to reflect that the child support award is made retroactive to January 14, 2011. We reverse the trial court judgment awarding Gregory Kevin Poole III the federal and state dependency tax deduction every other year, and render judgment awarding the total deduction to Kristie McMillin Poole. We affirm the remainder of the trial court judgment. All costs of this appeal are taxed equally between Gregory Kevin Poole III and Kristie McMillin Poole.

**AFFIRMED IN PART AS AMENDED, AND REVERSED IN PART AND RENDERED.**